UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| EQUIPMENT ACQUISITION RESOURCES, INC. | ) ) | Case No. 09 B 39937 |
| | ) | Hon. Timothy A. Barnes |
| Debtor. | ) ) | |
| _____ | ) ) ) | |
| WILLIAM A. BRANDT, JR., solely in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc., | ) ) ) ) | Adv. No. 11-02201 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| SUNTRUST LEASING CORPORATION | ) ) | |
| Defendant. | ) ) | |

## SECOND AMENDED COMPLAINT

William A Brandt, Jr., solely in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc. ("**EAR**"), by his attorneys, Diamond McCarthy LLP, brings this adversary proceeding against Suntrust Leasing Corporation ("**Suntrust**" or "**Defendant**").

## INTRODUCTION

1. This suit seeks the recovery of approximately $1.3 million that was fraudulently transferred from EAR to Suntrust. These transfers were part of a fraudulent equipment lease and financing scheme that caused the loss of tens of millions of dollars.

2. After EAR began to experience financial difficulties in late 2009, EAR employed turnaround specialists and restructuring counsel to assist the company. During the rehabilitation efforts, it became clear that EAR engaged in a Ponzi scheme utilizing equipment financing and

SECOND AMENDED COMPLAINT AGAINST SUNTRUST LEASING CORPORATION                                    PAGE 1

leases. As a result of the issues at EAR, Brandt was appointed as Chief Restructuring Officer to replace the then current directors and officers. Brandt filed a voluntary bankruptcy petition on behalf of EAR on October 23, 2009.

3. Prior to EAR's bankruptcy filing, Suntrust entered into leasing agreements with EAR related to certain equipment. Under the terms of the agreements, EAR made monthly payments to Suntrust from the inception of the agreements through at least August 2009. The underlying equipment leases and funds transferred to Suntrust were a part of and furthered the Ponzi scheme, serving to hinder, delay, and defraud EAR's creditors.

4. Brandt requests that this Court grant relief that will return the funds that were transferred to Suntrust as part of the scheme. Specifically, Plaintiff seeks: (a) the avoidance and recovery of $1,263,559.30 in fraudulent transfers under 11 U.S.C. § 548 or 740 ILCS 160/5; or in the alternative, (b) avoidance and recovery of $17,280.48 in transfers occurring within the preference period set forth in 11 U.S.C. § 547.

## PARTIES, JURISDICTION & VENUE

### I. Nature of the Proceeding

5. This is an adversary proceeding, pursuant to Fed. R. Bankr. P. 7001, which relates to the Chapter 11 proceeding captioned *In re Equipment Acquisition Resources, Inc.*, Case No. 09-B-39937 (Bankr. N.D. Ill., Eastern Div.).

### II. Plaintiff

6. On October 23, 2009, EAR filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court (the "**Petition Date**"). This Court confirmed the Plan on July 15, 2010 [DE #322]. Pursuant to the terms of the Plan, EAR executed the Plan Administrator Agreement, appointing Brandt as Plan Administrator.

7. The Plan expressly retains the EAR's Litigation Claims, as defined in Plan ¶1.43. Under the terms of the Plan and the Plan Administrator Agreement, Brandt has the responsibility and right to pursue the Litigation Claims on behalf of the Estate, including EAR's claims against Suntrust.

### III. Defendant

8. Defendant Suntrust is a corporation formed under the laws of the state of Virginia. Defendant was cited to appear through its registered agent Illinois Corporation Service at 801 Adlai Stevenson Drive, Springfield, Illinois 62703 and has appeared in this action.

### IV. Jurisdiction and Venue

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334 in that this action arises in, arises under, and/or relates to EAR's bankruptcy proceeding.

10. This action is, at least in part, a core proceeding under 28 U.S.C. §§ 157. In the alternative, Plaintiff consents to entry of a final order or judgment by this Court.

11. This Court has venue over this proceeding pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

### I. EAR's Formation and Operations

12. EAR was incorporated in 1997 under the laws of Illinois. Under its purported business model, EAR operated as a refurbisher of special machinery, a manufacturer of high-end technology parts, and a process developer for the manufacturing of high-technology parts. EAR allegedly purchased high-tech equipment near the end of its life-cycle at low prices relative to the cost of a new unit and then refurbished the equipment for sale to end-users at substantial gross margins using a propriety process. In 2009, EAR's operations came to an abrupt end when it could no longer repay its financing and lease obligations, despite its purported net income of

almost $35 million in 2008. Subsequent investigations by Brandt would uncover a massive fraudulent scheme involving the equipment purportedly in EAR's possession.

## II.     The Ponzi Scheme at EAR

13.     Beginning at least as early as 2003, EAR systematically and repeatedly entered into unnecessary and harmful financing and lease agreements for over-valued machinery. EAR's fraudulent scheme involved high-tech machinery near the end of its life cycle. As part of this fraudulent scheme, EAR entered into financing and lease agreements with numerous entities (the "**Financial Entities**") for equipment that was allegedly owned by Machine Tools Direct, Inc. ("**MTD**"). However, the equipment was actually owned by EAR, and MTD was a mere straw-man in EAR's scheme.

14.     Many, if not all, of MTD's sale prices grossly overstated the value of the underlying equipment. MTD "purchased" the underlying equipment from EAR around the same time MTD sold the equipment either to the Financial Entity (in the case of a lease) or to EAR (in the case of financing). Once MTD received funds from the Financial Entities, MTD transferred the proceeds to EAR, less a cut for MTD's role in the transaction (which was regularly calculated as 1 to 2% of the purchase price).

15.     EAR paid far more for the equipment under the financing or lease agreements than it ever received via the sale to MTD. As a result, EAR entered into an increasing number of these transactions in order to have sufficient funds to repay its current obligations. Of course, EAR had to make all required payments under its lease and financing obligations or risk having the scheme collapse. First, EAR needed to have a clean credit history to induce Financial Entities to enter into new leases and financing arrangements. Second, defaulting on any given obligation could cause a cascade of defaults that would cripple EAR's Ponzi scheme. EAR's

misconduct amounted to a Ponzi scheme where funds from later Financing Entities were used to repay EAR's obligations under earlier financing and lease obligations, including the transfers made to Suntrust. The Ponzi scheme rendered EAR insolvent at least as early as December 31, 2005.

16. Further evidence of the fraud indicates that EAR either sold the same piece of equipment to MTD multiple times to further the scheme. For instance, a physical count of equipment performed in 2009 demonstrated that EAR possessed less than half of the pieces of equipment reflected in the financial statements. This was consistent with EAR's practice of altering serial numbers on equipment to facilitate leasing one piece of equipment from multiple financial institutions. As a result, the Financial Entities have been unable to determine what, if any, security interest they hold in EAR's equipment.

### III. EAR's Revenues

17. As discussed above, MTD acted as the straw-man in EAR's Ponzi scheme. Although any potential legitimate revenues were commingled with funds derived from the fraud, Brandt's investigation indicates that fraudulent transactions with MTD constituted the vast majority of all revenues throughout the period in question:

- **2005** – Approximately 86% of EAR's cash receipts in 2005 were received from MTD. The total receipts associated with MTD were approximately $30.2 million, while receipts from other entities totaled approximately $4.9 million;

- **2006** – Approximately 87% of EAR's sales in 2006 (or $43.4 million) were to MTD, corresponding to sales to other entities of no more than $6.6 million;

- **2007** – Approximately 92% of EAR's sales in 2007 (or $50.5 million) were to MTD, with corresponding sales to other entities of approximately $4.4 million;

- **2008** – Approximately 97% of EAR's sales in 2008 (or $82.9 million) were to MTD, with corresponding sales to other entities of approximately $2.8 million; and

- **2009** – Approximately 92% of EAR's sales in 2009 (or $18.2 million) were to MTD, with corresponding sales to other entities of approximately $1.5 million.

Although this analysis plainly indicates that EAR had little funding available through potentially legitimate avenues, it does not paint the full picture. The sheer volume of EAR's leasing obligations required EAR to use funds from the Ponzi scheme to pay its financing and lease obligations, including those obligations to Suntrust.

### IV. EAR's Lease and Financing Obligations Were Funded By the Scheme

18. Because of the nature of the Ponzi scheme, EAR entered into an increasing number of equipment transactions each year to meet its current obligations. By December 31, 2005, EAR had capital lease payment obligations of approximately $37.8 million and equipment loan obligations of at least $693,132. By December 31, 2008, capital lease payment obligations had risen to $91.3 million and equipment loan obligations had risen approximately $17.8 million. In addition to capital leases and equipment loans, EAR's expense for equipment operating leases rose from $295,496 in 2005 to $15,900,485 in 2008.

19. Funds derived from potentially legitimate transactions were grossly insufficient to pay EAR's obligations under the equipment leases and financing arrangements. EAR's financial statements, including its statement of cash flows provide evidence:

- **2005** – EAR paid approximately $12.7 million on equipment lease obligations and long-term debt. These payments exceeded the amount of income from potentially legitimate operation by approximately $7.8 million. Despite the fact that EAR's potentially legitimate revenues were dwarfed by capital lease expenses, EAR's cash balances increased by $4,431,917 during 2005.

- **2006** – EAR paid approximately $23.0 million on equipment lease obligations and long-term debt.. This exceeded the amount of income from potentially legitimate operations by about $16.4 million. Notwithstanding this significant shortfall, EAR's cash balance only fell by $461,034.

- **2007** – EAR paid approximately $21.2 million on equipment lease obligations. These payments exceeded the amount of income from potentially legitimate operations by

approximately $16.9 million. Despite the significant outflows and minimal potentially-legitimate operations, EAR's cash balance rose by over $11.7 during 2007.

- **2008** – EAR paid approximately $36.2 million on equipment lease obligations. These payments exceeded the amount of income from potentially legitimate operations by approximately $33.4 million. Nevertheless, EAR's cash balances rose by over $9 million.

Put simply, any potentially legitimate operations at EAR did not fund the liability associated with the equipment leases and financing arrangements from the Ponzi scheme, including the payments to Suntrust.

20. Furthermore, EAR's other expenditures and shareholder distributions depleted any funds available from legitimate operations, establishing that money received from the Ponzi scheme was used to repay existing obligations. First, EAR had other paid expenses, such as taxes, employee wages, utilities, and rent, that depleted the amount of funding available to the company. For instance, EAR reported tax payments of $2.3 million in 2005 and $4.7 million in 2006. Second, massive shareholder distributions and other payments stripped the company of its assets. For 2007 and 2008 alone, shareholder distributions were approximately $23 million. As a result, little (if any) funding was available from legitimate operations to pay for the enormous expenses associated with EAR's lease and financing obligations. EAR's expenses, distributions, and increased cash reserves exceeded the amount of any potentially legitimate revenues.

V. **EAR's Eventual Collapse**

21. In 2009, after receiving numerous notices of default from its creditors, EAR sought the assistance of outside counsel and turn-around specialists in order to help in the company's rehabilitation. During its investigation, EAR's outside counsel and consultants discovered evidence of EAR's fraud in equipment leasing and financing activity.

22. Once it became apparent that EAR had engaged in this fraudulent activity, EAR's officers and directors resigned from their positions at EAR on October 8, 2009. Brandt was then elected as sole member of the board of directors and as the Chief Restructuring Officer ("**CRO**"). The CRO was vested with the power to assume full control of all operations of EAR and all the powers and duties of its President, Chief Executive, and Treasurer. Pursuant to these powers, the CRO filed EAR's voluntary Chapter 11 bankruptcy petition to manage EAR's assets for the benefit of all creditors. Under the Plan, Brandt was appointed as the Plan Administrator for EAR.

23. With this Court's permission, Brandt abandoned EAR's equipment and inventory to its lenders in late 2009. At the time of the abandonment, the inventory and equipment had a net book value of over $130 million. In February 2011, an auction of EAR's inventory and equipment was conducted, and the reconciliation report shows that the gross proceeds were approximately $6.9 million. EAR's creditors are currently engaged in litigation concerning the auction proceeds, with multiple parties claiming liens over the same equipment. The results of the auction and related litigation are consistent with the nature of the fraud, whereby the equipment subject to the leases and financing transactions was vastly overvalued and pledged multiple times.

24. Since his appointment as Plan Administrator, Brandt has continued his investigation of the fraud. This continued investigation revealed evidence of the fraud at least as early as 2003. Furthermore, for the period of from 2005 through the Petition Date, there appears to be a minimal amount of potentially legitimate business activity.

## VI. Suntrust's Lease Agreements with EAR

25. Suntrust entered into leases with EAR related to certain equipment (the "**Leases**"). Under the terms of the Leases, EAR was required to make monthly payments to Suntrust with respect to the equipment which was identified in the Leases.

26. EAR entered into the Leases and made required payments in furtherance of the Ponzi scheme. As further described below, the machinery related to the Leases was purchased from MTD and was part of the Ponzi scheme. Because EAR owned the equipment in question prior to the date of the Leases, the transactions were unnecessary from a business standpoint. Rather, EAR entered into the Leases in order to generate cash for use in paying other outstanding lease obligations as part of the Ponzi scheme.

27. EAR used funds derived from the Ponzi scheme to make payments to Suntrust under the Leases. As outlined in the attached exhibits, Suntrust received transfers from EAR in 2006, 2007, and 2008, during which time EAR generated almost 93% of its revenues from fraudulent sales to MTD. Thus, any potential revenues from legitimate transactions were woefully insufficient to pay EAR's operating expenses and leasing and financing obligations. EAR was therefore required to use funds generated from the Ponzi scheme to pay its lease and financing obligations, including the transfers to Suntrust that Brandt now seeks to recover. Moreover, EAR made payments to Suntrust because failing to do so would have caused cross-defaults and damaged its perceived creditworthiness, thereby halting EAR's ability to enter into additional lease and financing transactions. Because the transfers made to Suntrust were part of the Ponzi scheme, the transfers were made with the actual intent to hinder, delay, and defraud EAR's remaining creditors.

### A. The September 2005 Lease

28.  On or about September 7, 2005, EAR and Suntrust entered into a lease agreement (the "**September Lease**") related to one piece of equipment: A Strasbaugh Model 7AF Wafer Grinder. According to the lease, the capitalized cost was $775,000 and the required monthly payments were $16,148.60.

29.  On September 14, 2005, EAR recorded the receipt of $759,500 from MTD. This amount was 98% of the listed value of the September Lease asset, thereby allowing MTD to retain 2% as its share on the underlying sale.

### B. The October 2006 Lease

30.  On or about October 27, 2006, EAR and Seals Leasing Group ("**Seals**") entered into Equipment Lease Agreement No. 05344 (the "**October Lease**"). Under the terms of the lease, EAR was required to make monthly payments of $17,280.48. The lease related to two pieces of equipment: (a) a Hoffman Double Sided Polisher Model 3100; and (b) a Strasbaugh Backgrinder Model 7AF. Seals assigned its rights under the October Lease to Suntrust. EAR documented the lease by recording a $518,000 capital lease asset on January 3, 2007.

31.  On October 27, 2006, EAR also recorded the sale of two pieces of equipment to MTD. Specifically, EAR sold two pieces of equipment to MTD[1]:

| Description | Amount |
| --- | --- |
| FG-PRH-3100 - P.R. HOFFMAN DS LAPPER MODEL: 3100 | 164,640.00 |
| Repaired - Item: FG-STB-7AF - STRASBAUGH BACKGRINDER MODEL: 7AF | 343,000.00 |
|  | $ 507,640.00 |

---

[1] According to P.R. Hoffman's website, a model 3100 is a "double sided lapping and polishing" machine. http://www.prhoffman.com/pr151931.html

The total invoice amount associated with this sale was 98% of the value of the capital lease asset recorded for the October Lease, thereby allowing MTD to retain 2% as its share on the underlying sale.

## CLAIMS FOR RELIEF

### COUNT I – FRAUDULENT TRANSFER
### UNDER 11 U.S.C. § 548(a)(1)(A)

32. The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

33. In accordance with the requirements of the Leases, EAR made transfers to Suntrust from its bank account(s) totaling $851,520.64 from at least December 2007 through August 2009 (the "**Lease Transfers**").  The transfers are more fully described in Exhibit A, which is attached hereto.  Discovery in this matter may identify additional transfers made to Suntrust under the terms of the Leases.

34. The Lease Transfers were made within two years of the Petition Date.

35. The Lease Transfers were made as a part of the Ponzi scheme at EAR.  EAR entered into the Leases in furtherance of EAR's fraudulent scheme.  Each of the Leases generated cash for EAR through the "sale" of the equipment to MTD.  These sham transactions provided EAR with the funds it required to pay existing obligations on equipment financing and lease obligations that were part of the fraudulent scheme.  Furthermore, later transactions with other Financing Entities followed the same pattern as the Leases with Suntrust.  These fraudulent transactions then provided EAR with the funds used to pay Suntrust under the terms of the Leases.  This transactional-pyramid constitutes a Ponzi scheme whereby funds received from later fraudulent transactions are used to fund prior outstanding obligations.  Therefore, the Lease

Transfers were made with the actual intent to hinder, delay, or defraud entities to which EAR was or became indebted to on or after the date of the transfer.

36.  Pursuant to 11 U.S.C. § 548(a)(1)(A), the plaintiff is entitled to judgment avoiding the Lease Transfers.

### COUNT II – FRAUDULENT TRANSFER
### UNDER 740 ILCS 160/5(a)(1)

37.  The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

38.  In accordance with the requirements of the Leases, EAR made the Lease Transfers as described more fully in Exhibit A.  In addition to the Lease Transfers totaling $851,520.64, EAR made additional transfers to Suntrust totaling at least $412,038.66 under the terms of the Leases from its bank account(s) prior to November 2007.  These additional transfers are more fully described in Exhibit B (the "**Additional Lease Transfers**"), which is attached hereto. Discovery in this matter may identify additional transfers made to Suntrust under the terms of the Leases.

39.  The Lease Transfers and the Additional Lease Transfers were made within four years of the Petition Date.

40.  The Lease Transfers and Additional Lease Transfers were made as a part of the Ponzi scheme at EAR.  EAR entered into the Leases in furtherance of EAR's fraudulent scheme. Each of the Leases generated cash for EAR through the "sale" of the equipment to MTD.  These sham transactions provided EAR with the funds it required to pay existing obligations on equipment financing and lease obligations that were part of the fraudulent scheme.  Furthermore, later transactions with other Financing Entities followed the same pattern as the Leases with Suntrust.  These fraudulent transactions then provided EAR with the funds used to pay Suntrust

under the terms of the Leases. This transactional-pyramid constitutes a Ponzi scheme whereby funds received from later fraudulent transactions are used to fund prior outstanding obligations. Therefore, the Lease Transfers and Additional Lease Transfers were made with the actual intent to hinder, delay, or defraud entities to which EAR was or became indebted to on or after the date of the transfer.

41. Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5(a)(1), the Plaintiff is entitled to judgment avoiding the Lease Transfers and the Additional Lease Transfers.

COUNT III – PREFERENCE
UNDER 11 U.S.C. § 547

42. The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

43. In the 90 days immediately preceding the Petition Date, EAR transferred to Suntrust the sum of $17,280.48 (the "**Preferential Transfer**"). Specifically, Suntrust received the transfer from EAR's bank account at Norstates Bank on or about August 7, 2009.

44. The Preferential Transfer was made to or for the benefit of Suntrust, a creditor of EAR.

45. The Preferential Transfer was made for or on account of an antecedent debt owed by EAR before the Preferential Transfer was made.

46. The Preferential Transfer was made while EAR was insolvent.

47. The Preferential Transfer was made on or within 90 days before the Petition Date.

48. The Preferential Transfer enabled Suntrust to receive more than it would have received if the case were a case under Chapter 7 of title 11 of the United States Bankruptcy Code (the "**Code**"), the Preferential Transfer had not been made, and the Defendant received payment on such debt to the extent provided by the provisions of the Code.

49.    Pursuant to 11 U.S.C. § 547, the Plaintiff is entitled to judgment avoiding the Preferential Transfer.

### COUNT IV – RECOVERY OF THE VALUE OF THE AVOIDED TRANSFERS UNDER 11 U.S.C. § 550

50.    The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

51.    For the reasons set forth above, Plaintiff is entitled to avoid the Lease Transfers the Additional Lease Transfers, and the Preferential Transfer.

52.    Suntrust was the initial transferee of the Lease Transfers the Additional Lease Transfers, and the Preferential Transfer as Suntrust received the funds transferred from EAR.

53.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover the value of the Lease Transfers the Additional Lease Transfers, and the Preferential Transfer from Suntrust.

### COUNT V – DISALLOWANCE OF CLAIM UNDER 11 U.S.C. § 502(d)

54.    The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

55.    The Lease Transfers and Additional Lease Transfers are avoidable under 11 U.S.C. § 548 and 740 ILCS 160/5.  The Preferential Transfer is avoidable under 11 U.S.C. § 547.

56.    Pursuant to 11 U.S.C. § 502(d), any claims of Defendant against the Debtor must be disallowed until such time as Defendant pays the Lease Transfers, Additional Lease Transfers, and Preferential Transfer as provided in 11 U.S.C. § 502(d).

### **PRAYER**

Wherefore, Plaintiff respectfully requests that the Court enter judgment and grant it the following relief against Suntrust:

1. Entering an order of judgment avoiding the Lease Transfers under 11 U.S.C. § 548(a)(1)(A);

2. Entering an order of judgment avoiding the Lease Transfers and the Additional Lease Transfers under 740 ILCS 160/5(a)(1);

3. Entering an order of judgment avoiding the Preferential Transfer under 11 U.S.C. 547;

4. Entering an order of judgment in the amount of $1,263,559.30 in favor of the Plaintiff and against Suntrust;

5. Entering an order disallowing any payment or claim held by Defendant, to the extent on exists, pursuant to 11 U.S.C. § 502(d);

6. Prejudgment and post-judgment interest as allowed by law; and

7. All other relief to which it is entitled.

Dated:  October 31, 2012                    Respectfully submitted,

          /s/ *Jon Maxwell Beatty*
One of the attorneys for Plaintiff
William A. Brandt, Jr., solely in his capacity as Plan Administrator for Equipment Acquisition Resources, Inc.

Allan B. Diamond (TX Bar 05801800)
adiamond@diamondmccarthy.com
Jon Maxwell Beatty (TX Bar 24051740)
mbeatty@diamondmccarthy.com
Diamond McCarthy LLP
909 Fannin, Suite 1500
Houston, Texas 77010
Tel:  (713) 333-5100
Fax:  (713) 333-5199

**Exhibit A to Complaint**
*The "Lease Transfers"*

| Date | Amount |
|---|---:|
| 12/10/2007 | $ 16,148.60 |
| 1/9/2008 | $ 16,148.60 |
| 1/31/2008 | $ 17,280.48 |
| 2/11/2008 | $ 16,148.60 |
| 2/12/2008 | $ 217,500.00 |
| 3/3/2008 | $ 17,280.48 |
| 3/10/2008 | $ 16,148.60 |
| 3/31/2008 | $ 17,280.48 |
| 4/9/2008 | $ 16,148.60 |
| 5/1/2008 | $ 17,280.48 |
| 5/9/2008 | $ 16,148.60 |
| 6/2/2008 | $ 17,280.48 |
| 6/9/2008 | $ 16,148.60 |
| 6/30/2008 | $ 17,280.48 |
| 7/9/2008 | $ 16,148.60 |
| 7/31/2008 | $ 17,280.48 |
| 8/11/2008 | $ 16,148.60 |
| 9/3/2008 | $ 17,280.48 |
| 9/9/2008 | $ 16,148.60 |
| 10/1/2008 | $ 17,280.48 |
| 10/9/2008 | $ 16,148.60 |
| 10/31/2008 | $ 17,280.48 |
| 11/12/2008 | $ 16,148.60 |
| 12/2/2008 | $ 17,280.48 |
| 12/9/2008 | $ 16,148.60 |
| 1/9/2009 | $ 16,148.60 |
| 2/2/2009 | $ 17,280.48 |
| 2/10/2009 | $ 16,148.60 |
| 3/3/2009 | $ 17,280.48 |
| 3/10/2009 | $ 16,148.60 |
| 3/31/2009 | $ 17,280.48 |
| 4/9/2009 | $ 16,148.60 |
| 5/1/2009 | $ 17,280.48 |
| 5/11/2009 | $ 16,148.60 |
| 6/2/2009 | $ 17,280.48 |
| 6/9/2009 | $ 16,148.60 |
| 7/1/2009 | $ 17,280.48 |
| 7/9/2009 | $ 16,148.60 |
| 8/7/2009 | $ 17,280.48 |
| | $ 851,520.64 |

**Exhibit B to Complaint**
*The "Additional Lease Transfers"*

| Date | Amount |
|---|---|
| 4/11/2006 | $ 16,148.60 |
| 5/9/2006 | $ 16,148.60 |
| 6/9/2006 | $ 16,148.60 |
| 7/11/2006 | $ 16,148.60 |
| 8/9/2006 | $ 16,148.60 |
| 9/11/2006 | $ 16,148.60 |
| 10/11/2006 | $ 16,148.60 |
| 11/9/2006 | $ 16,148.60 |
| 12/11/2006 | $ 16,148.60 |
| 1/31/2007 | $ 17,280.48 |
| 2/9/2007 | $ 32,297.30 |
| 4/2/2007 | $ 17,280.48 |
| 4/9/2007 | $ 16,148.60 |
| 4/30/2007 | $ 17,280.48 |
| 5/9/2007 | $ 16,148.60 |
| 5/31/2007 | $ 17,280.48 |
| 6/11/2007 | $ 16,148.60 |
| 7/5/2007 | $ 17,280.48 |
| 7/9/2007 | $ 16,148.60 |
| 7/30/2007 | $ 17,280.48 |
| 8/9/2007 | $ 16,148.60 |
| 8/31/2007 | $ 17,280.48 |
| 9/10/2007 | $ 16,148.60 |
| 9/20/2007 | $ 16,549.00 |
| | $ 412,038.66 |