UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| EQUIPMENT ACQUISITION | ) | Case No. 09 B 39937 |
| RESOURCES, INC. | ) | |
| | ) | Hon. Timothy A. Barnes |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| | ) | |
| WILLIAM A. BRANDT, JR., solely in his | ) | Adv. No. 11-02201 |
| capacity as Plan Administrator for Equipment | ) | |
| Acquisition Resources, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SUNTRUST LEASING CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |

## THIRD AMENDED COMPLAINT

William A Brandt, Jr., solely in his capacity as Plan Administrator for Equipment

Acquisition Resources, Inc. ("**EAR**"), by his attorneys, Diamond McCarthy LLP, brings this

adversary proceeding against Suntrust Leasing Corporation ("**Suntrust**" or "**Defendant**").

## INTRODUCTION

1.      This suit seeks the recovery of $1,263,559.30 that was fraudulently transferred

from EAR to Suntrust. These transfers were part of a fraudulent equipment lease and financing

scheme that caused the loss of tens of millions of dollars.

2.      EAR engaged in a massive fraud resembling a Ponzi scheme whereby funds

derived from later fraudulent equipment leases and financings were used to pay obligations that

arose from earlier fraudulent transactions (the "**Fraud**").  The Fraud was unsustainable on its

face because the funds EAR received in a given fraudulent transaction were less than the resulting obligation on the related lease or financing arrangement.   Moreover, EAR's principals removed millions of dollars from the company, further reducing the funds available to pay EAR's obligations.   Because EAR was not generating revenue from the equipment it leased or financed, the company continually entered into new equipment leases and financing agreements in order to fill the financial gap and generate the funds required to pay its current obligations. Prior to 2009, EAR had ready access cash through new fraudulent leases and financing transactions, and it was able to make the large monthly payments on its existing equipment obligations.   But as the credit market contracted, the opportunity to enter into these transactions vanished, and EAR could no longer support its gargantuan equipment obligations.

3.      EAR entered into fraudulent lease and finance agreements with third parties on equipment EAR already owned for the sole purpose of generating cash.   Pursuant to the fraudulent scheme, EAR approached third party financers about equipment purportedly owned by Machine Tools Direct, Inc. ("**MTD**").   The financers purchased the equipment and leased it to EAR or loaned EAR the funds to "purchase" the equipment itself.   In reality, EAR, and not MTD, owned the equipment.   MTD retained only a small cut of the purchase price, and provided the remaining funds to EAR.   EAR then transferred the funds to its principals or kept the cash for use in connection with the fraud.   These transactions were completely unnecessary from a business standpoint for at least two reasons: (a) EAR had no use for the machinery; and (b) it already owned the equipment in question.   Furthermore, EAR altered serial numbers on equipment resulting in multiple leases and financings on the same pieces of machinery.

4.      Transfers to Suntrust were made as a part of the Fraud and with the actual intent to hinder, delay, or defraud EAR's creditors.   All of the payments to Suntrust were payments for

equipment that EAR did not need, did not use, and obtained through sham transactions through MTD. EAR made the transfers with the express purpose of maintaining the façade of a legitimate business even though the vast majority of EAR's revenues were derived from the Fraud. Had EAR failed to make payments on its obligations, including those to Suntrust, the resulting defaults would have rendered the company unable to generate the new leases and financing arrangements necessary to perpetuate the Fraud.

5.      After EAR began to experience financial difficulties in late 2009, EAR employed turnaround specialists and restructuring counsel to assist the company. During the rehabilitation efforts, it became clear that the Fraud began at least as early as 2003. As a result of the issues at EAR, Brandt was appointed as Chief Restructuring Officer to replace the then current directors and officers. Brandt filed a voluntary bankruptcy petition on behalf of EAR on October 23, 2009.

6.      Brandt requests that this Court grant relief that will return the funds that were transferred to Suntrust as part of the scheme. Specifically, Plaintiff seeks: (a) the avoidance and recovery of $1,263,559.30 in fraudulent transfers under 11 U.S.C. § 548 or 740 ILCS 160/5; or in the alternative, (b) avoidance and recovery of  $17,280.48 in transfers occurring within the preference period set forth in 11 U.S.C. § 547.

## PARTIES, JURISDICTION & VENUE

### I.      Nature of the Proceeding

7.      This is an adversary proceeding, pursuant to Fed. R. Bankr. P. 7001, which relates to the Chapter 11 proceeding captioned *In re Equipment Acquisition Resources, Inc.*, Case No. 09-B-39937 (Bankr. N.D. Ill., Eastern Div.).

## II.   Plaintiff

8.      On October 23, 2009, EAR filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court (the "**Petition Date**").  This Court confirmed the Plan on July 15, 2010 [DE #322].  Pursuant to the terms of the Plan, EAR executed the Plan Administrator Agreement, appointing Brandt as Plan Administrator.

9.      The Plan expressly retains EAR's Litigation Claims, as defined in Plan ¶1.43. Under the terms of the Plan and the Plan Administrator Agreement, Brandt has the responsibility and right to pursue the Litigation Claims on behalf of the Estate, including EAR's claims against Suntrust.

## III.   Defendant

10.      Defendant Suntrust is a corporation formed under the laws of the state of Virginia. Defendant was cited to appear through its registered agent Illinois Corporation Service at 801 Adlai Stevenson Drive, Springfield, Illinois 62703 and has appeared in this action.

## IV.   Jurisdiction and Venue

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334 in that this action arises in, arises under, and/or relates to EAR's bankruptcy proceeding.

12.      This action is, at least in part, a core proceeding under 28 U.S.C. §§ 157.  In the alternative, Plaintiff consents to entry of a final order or judgment by this Court.

13.      This Court has venue over this proceeding pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

## I.   EAR's Operations

14.      The vast majority of EAR's business consisted of one of two types of equipment transactions: (a) equipment leases; or (b) equipment financings.  EAR entered into frequent

equipment leases with financial institutions.  There, the financial institution would purchase machinery equipment MTD purportedly owned and then lease the machinery to EAR.  In other instances, EAR entered into loan agreements with third-party financers for the purchase of equipment purportedly owned by MTD.  In both instances, the third party paid MTD at the outset of the transaction, and MTD then sent the vast majority of the funds to EAR.  EAR would then make monthly payments to the third-party financial institution over the period of several years.  But EAR did not enter into these transactions for the purpose of legitimate business operations— EAR did not need or use the underlying equipment.  Rather, these transactions simply provided a mechanism whereby EAR could gain access to millions of dollars of "up-front" cash.

15.     As a part of the Fraud, EAR leased or purchased the same machinery multiple times.  To accomplish this, EAR altered a large number of the machines' serial numbers.  The plates bearing the serial numbers were created in a manner that gave the appearance that they were attached to the equipment using rivets.  But these serial numbers were actually attached using a simple adhesive, which allowed the plates to be removed and changed as needed.  Brandt was able to confirm at least one instance where serial numbers were altered after machinery was leased.  There, the lessor had previously visited EAR and taken pictures of its leased equipment.  But when the lessor visited the company after Brandt was named CRO, the equipment had different serial numbers affixed.  The new serial numbers were attached using the adhesive, which were easily removed.  This practice was further confirmed by the statements of a former EAR employee, who said that he changed serial numbers on equipment.

16.     A physical count of equipment performed in 2009 demonstrated that EAR possessed less than half of the pieces of equipment reflected in the financial statements.  This was consistent with EAR's practice of altering serial numbers on equipment to facilitate leasing

one piece of equipment from multiple financial institutions.  As a result of this practice, EAR's creditors have been unable to determine what, if any, security interest they hold in EAR's equipment.  Moreover, a physical examination of the machinery revealed little more than a junkyard of inoperable machines and spare parts.

17.     Post-petition events indicate that the equipment involved in the Fraud was vastly overvalued.  With this Court's permission, Brandt abandoned EAR's equipment and inventory to its lenders in late 2009.  At the time of the abandonment, the inventory and equipment had a net book value of over $130 million.   In February 2011, an auction of EAR's inventory and equipment was conducted, and the reconciliation report shows that the gross proceeds were approximately $6.9 million, or approximately 5% of the value stated in EAR's records.  EAR's creditors are currently engaged in litigation concerning the auction proceeds, with multiple parties claiming liens over the same equipment.  The results of the auction and related litigation are consistent with the nature of the Fraud, whereby the equipment subject to the leases and financing transactions was vastly overvalued and pledged multiple times.

18.     So long as EAR was able to generate new leases or financing transactions, the company had ample funds to make the monthly payments on outstanding equipment obligations created by the Fraud all while transferring millions of dollars to or for the benefit of its principals.  However, EAR's operations came to an abrupt end in 2009 when, as a result of the financial crisis, the credit market contracted sharply.  As a result of EAR's inability to obtain additional leases and loans, it could no longer repay its financing and lease obligations and defaulted on many of the agreements.

19.     During the relevant period, Sheldon Player ("**Player**") directed and controlled EAR's operations.  From at least 2003 through 2007, Player owned 50% of EAR's shares, with

the remainder being held by his wife, Donna Malone ("**Malone**").   Player officially acted as a director and the president of EAR during this period.   On or about March 19, 2007, Player transferred his 50% interest in EAR as follows: (a) 40% to Malone; and (b) 10% to Mark W. Anstett ("**Anstett**").   As a result of this transfer, Player officially held no equity interest in EAR and was no longer named as corporate officer.   Malone was named Chief Executive Officer, and Anstett was named President.   In reality, Player's role at EAR remained essentially unchanged.

20.     Player continued performing the duties of an officer at EAR, managing and directing the affairs of the company in all major respects with the assistance of Anstett, Malone, and others.   For instance, Player maintained his role in dealings with EAR's auditors, providing them with documents, answering questions, and directing their interactions with EAR's creditors and potential creditors.   Furthermore, Player maintained his authorization with respect to EAR's bank accounts and directed EAR's employees.

## II.   Player's Criminal Past

21.     In March of 1986, Player entered into a guilty plea for two counts of interstate transportation of money taken by fraud and was sentenced to five years in prison.   Player's guilty plea related to a leasing fraud involving an entity known as Greyhound Financial Group ("**GFC**").   This information was readily available to the Defendant via the internet or public documents at the time of its transactions with EAR.

22.     Over the course of six years beginning in 1979, GFC disbursed over $74 million to Player through various loans and equipment leasing transactions.   Under the equipment leasing transactions, GFC would purchase equipment which it would then lease to Player.   Player, in turn would sublease the equipment to the end-user.   In many of these equipment leasing transactions, the equipment GFC purchased was to be shipped directly to the end-user by

the vendor or manufacturer of the equipment.  As a result, GFC never received or inspected the equipment it purportedly purchased.  GFC always paid Player or an affiliated company for the equipment in question.  In addition, Player obtained five loans from Greycas, Inc. ("**Greycas**"), a wholly owned subsidiary of GFC.

23.      Player ultimately admitted to fraudulent activities related to the GFC and Greycas transactions.  Player stated that he defrauded GFC into entering into the equipment lease transactions and misled GFC into believing that the equipment and subleases existed, and that the GFC funds would be used towards equipment leases as intended by GFC.  In virtually every case, the equipment did not exist.  Rather, the sham transactions were designed to allow Player to obtain millions of dollars from GFC for use in his other business ventures.

24.      But when Player was released prison, he did not leave his criminal past behind.  Rather, Player utilized EAR to commit yet another equipment-based fraud.

### III.      MTD's Role in the Fraud at EAR

25.      Beginning at least as early as 2003, Player caused EAR to systematically and repeatedly enter into unnecessary and harmful financing and lease agreements.  As part of the Fraud, EAR entered into financing and lease agreements with numerous third-party entities (the "**Financial Entities**")[1] for equipment that was allegedly owned by MTD.  However, the equipment was actually owned by EAR, and MTD was a straw-man or mere dummy in EAR's scheme.

---

[1] The referenced entities include, but are not limited to, the following: Republic Bank of Chicago; Deerbart Financial; Millennium Bank; US Bank, ACC Alliance Commercial Capital; American Bank; Suntrust Leasing; CIT Group; Charter Bank; Comerica Leasing; Hewlett Packard Financial; KLC Financial; Leasing One; IBM Credit; Pentech Financial; People's Capital and Leasing Corp.; PlainsCapital Leasing; ICON EAR; ICON EAR II; First Premier Capital; and TD Banknorth Leasing.

26.     Many, if not all, of MTD's sale prices grossly overstated the value of the underlying equipment.  MTD "purchased" the underlying equipment from EAR around the same time MTD sold the equipment either to the Financial Entity (in the case of a lease) or to EAR (in the case of financing).  Once MTD received funds from the Financial Entities, MTD transferred the proceeds to EAR, less a cut for MTD's role in the transaction (which was regularly calculated as 1 to 2% of the purchase price).  The lease transactions with MTD are graphically summarized represented as follows:



As shown above, the individual equipment transactions are largely circular in nature, whereby the title or right to possession of the underlying equipment both begins and ends with EAR. Moreover, MTD's ownership and possession of the equipment was a sham: (a) the equipment was rarely (if ever) moved from EAR's facilities; and (b) the purported sale to MTD was often papered after MTDs transaction with the Financial Entities for the purposes of justifying the transfer of cash from MTD to EAR.

27.     EAR paid far more for the equipment under the financing or lease agreements than it ever received via the "sale" to MTD.  The total amount that EAR was required to pay the Financial Entities under the terms of the leases or loans exceed the purchase price of the equipment.  And MTD retained a cut of the "sale" proceeds for participating in the Fraud, thereby reducing the funds available to EAR to make required monthly payments.  Moreover, Player, Anstett, and Malone received millions of dollars in distributions and other benefits that further dissipated the funds available for EAR's use.

28.     As a result, EAR was required to enter into an increasing number of these transactions in order to acquire sufficient funds to repay its existing obligations.  Of course, EAR had to make all required payments under its lease and financing obligations or risk having the scheme collapse.  First, EAR needed to have a clean credit history to induce Financial Entities to enter into new leases and financing arrangements.  Second, defaulting on any given obligation could cause a cascade of defaults that would cripple EAR's fraudulent scheme.  EAR's misconduct amounted to a Ponzi or Ponzi-like scheme where funds from later Financing Entities were used to repay EAR's obligations under earlier financing and lease transactions, including the transfers made to Suntrust.

29.     Strangely, given the high tech, customer intensive engineering and designing, and heavy machinery components of its purported business, EAR only employed twenty-one people (including Player).  As of 2009 EAR had 853 pieces of equipment subject to lease or financing.  This meant that EAR had a *forty* pieces of equipment per employee.  Moreover, EAR purportedly owned an additional 1,145 machines in inventory, or about *fifty-four* pieces of equipment for each employee.  These twenty-one people were supposedly responsible for selling customized industrial machinery to customers, working with customers to engineer

semiconductor wafers for research and development purposes, working with customers to design and engineer equipment for use in semiconductor and nanotechnology manufacturing and to oversee the manufacture of said equipment, providing EAR's warranty services for the multi-million dollar customized equipment, running EAR's own manufacturing equipment to actually refurbish equipment to customer specifications, and all other functions relating to running a high tech manufacturing and sales business.

30.    MTD filed for bankruptcy in 2011.  Despite its purported ownership of hundreds of pieces of machinery that were sold to EAR, the trustee in that case informed the court that the entity had no substantial assets.  As a result, the estate was closed as a no-asset bankruptcy. George Ferguson ("**Ferguson**"), MTD's owner and manager, also filed for personal bankruptcy. Brandt objected to dischargeability of debt under 11 U.S.C. § 523, citing Ferguson's participation in the Fraud as the basis.  Ferguson did not answer or otherwise appear in the adversary, and as a result, Brandt obtained a default judgment.

### IV.    EAR's Revenues

31.    As discussed above, MTD acted as the straw-man in EAR's Fraud.  Although any potential legitimate revenues were commingled with funds derived from the Fraud, Brandt's investigation indicates that fraudulent transactions with MTD constituted the vast majority of all revenues throughout the period in question:

- **2005** – Approximately 86% of EAR's cash receipts in 2005 were received from MTD. The total receipts associated with MTD were approximately $30.2 million, while receipts from other entities totaled approximately $4.9 million;

- **2006** – Approximately 87% of EAR's sales in 2006 (or $43.4 million) were to MTD, corresponding to sales to other entities of no more than $6.6 million;

- **2007** – Approximately 92% of EAR's sales in 2007 (or $50.5 million) were to MTD, with corresponding sales to other entities of approximately $4.4 million;

- **2008** – Approximately 97% of EAR's sales in 2008 (or $82.9 million) were to MTD, with corresponding sales to other entities of approximately $2.8 million; and

- **2009** – Approximately 92% of EAR's sales in 2009 (or $18.2 million) were to MTD, with corresponding sales to other entities of approximately $1.5 million.

Although this analysis plainly indicates that EAR had little funding available through potentially legitimate avenues, it does not paint the full picture. The sheer volume of EAR's leasing obligations required EAR to use funds from the Fraud to pay its financing and lease obligations, including those obligations to Suntrust.

32.    EAR masked the volume of its sales to MTD within its financial reporting. For example, EAR told its auditors that sales to MTD in 2007 totaled just over $1 million, or approximately 2% of its sales. Similarly, EAR informed its auditors that sales to MTD totaled only $1.6 million for 2008. However, EAR's general ledgers reveal that the vast majority of all its sales were to MTD. Player and MTD concealed their relationship by telling EAR's auditor that MTD served as a broker for equipment sales to third parties. However, the list of end users provided by EAR was fabricated, and did not identify the Financial Entities. Rather, these lists indicated that the ultimate purchasers on sales to MTD were entities such as Motorola, Inc., Honeywell, Inc., and Dow Corning, Inc. Although MTD would not confirm the specific identity of the end purchasers for EAR's accountants on the basis that the information was "proprietary," Ferguson stated that the customers were "primarily semiconductor and optical manufacturers." This was consistent with the Fraud, whereby EAR attempted to conceal its relationship with MTD and the existence of the sham sales.

## V.    EAR Incurred Substantial Obligations Throughout the Relevant Period

33.    Because of the nature of the Fraud and the knowledge that the existing obligations could not be repaid through legitimate operations, EAR entered into an increasing number of

equipment transactions each year to meet its current obligations.  By December 31, 2005, EAR

had capital lease[2] payment obligations of approximately $37.8 million and equipment loan

obligations of at least $693,132.  By December 31, 2008, capital lease payment obligations had

risen to $91.3 million and equipment loan obligations had risen to approximately $17.8 million.

In addition, EAR's expense for equipment operating leases[3] rose from $295,496 in 2005 to

$15,900,485 in 2008.  As of June 30, 2009, EAR's outside consultants identified equipment

obligations of at least $84.5 million in capital leases, $56.5 million in operating leases, and $17.9

million in notes payable.  The leased/financed equipment monthly debt-service burden as of June

30, 2009 was over $5.1 million.

     34.     From the period of 2005 through 2009, EAR continuously incurred substantial

obligations.  In fact, EAR incurred millions of dollars in new equipment obligations in each

month leading up to 2009:

| Date | Amount |
|---|---|
| October 2005 | $4,050,000 |
| November 2005 | $2,885,000 |
| December 2005 | $12,294,999 |
| January 2006 | $1,344,000 |
| February 2006 | $345,000 |
| March 2006 | $678,000 |
| April 2006 | $1,029,500 |

---

[2] Capital leases transfer substantially all the benefits and risks of ownership to the lessee (EAR).
These leases often last for the entire useful life of the asset or provide that the lessee will retain
ownership of the asset after the lease term is complete.  Accounting principles require that they
are recorded on the company's balance sheets as assets that are depreciated over time.

[3] An operating lease is one where the lessee (EAR) does not assume the risks of ownership of the
property, but instead only receives the use of the property for a limited time in exchange for
periodic rental payments.  For operating leases, the lessee (EAR) does not list the equipment as
an asset on its financial statements.

| Date | Amount |
|---|---|
| May 2006 | $1,040,000 |
| June 2006 | $4,341,000 |
| July 2006 | $2,729,000 |
| August 2006 | $2,245,000 |
| September 2006 | $1,490,000 |
| October 2006 | $1,233,000 |
| November 2006 | $11,504,904 |
| December 2006 | $4,975,000 |
| January 2007 | $8,439,000 |
| February 2007 | $1,800,000 |
| March 2007 | $1,510,000 |
| April 2007 | $1,575,000 |
| May 2007 | $7,354,100 |
| June 2007 | $1,258,000 |
| July 2007 | $2,307,000 |
| August 2007 | $7,543,055 |
| September 2007 | $6,393,000 |
| October 2007 | $7,392,955 |
| November 2007 | $3,762,500 |
| December 2007 | $8,215,000 |
| January 2008 | $4,865,000 |
| February 2008 | $5,855,110 |
| March 2008 | $5,235,000 |
| April 2008 | $7,450,000 |
| May 2008 | $13,735,005 |
| June 2008 | $17,094,000 |
| July 2008 | $4,488,086 |
| August 2008 | $7,003,723 |
| September 2008 | $25,784,555 |

| Date | Amount |
|------|--------|
| October 2008 | $999,110 |
| November 2008 | $5,871,505 |
| December 2008 | $9,425,000 |
| January 2009 | $3,100,000 |
| February 2009 | $0 |
| March 2009 | $750,000 |
| April 2009 | $0 |
| May 2009 | $2,243,500 |
| June 2009 | $9,612,847 |
| July 2009 | $1,300,450 |
| August 2009 | $1,515,312 |

As the table above indicates,[4] the obligations EAR assumed on a monthly basis were substantial. Given EAR's relatively nominal potentially legitimate revenue, it could not have survived absent the Fraud.

## VI.   EAR's Lease and Financing Obligations Were Funded By the Fraud

35.   EAR's obligations under the equipment leases and financing arrangements could only be paid through funds derived from the Fraud.  EAR's financial statements, including its statement of cash flows provide evidence:

- **2005** – EAR paid approximately $12.7 million on equipment lease obligations and long-term debt.  These payments exceeded the amount of income from potentially legitimate operation by approximately $7.8 million.

- **2006** – EAR paid approximately $23.0 million on equipment lease obligations and long-term debt.  This exceeded the amount of income from potentially legitimate operations by about $16.4 million.

---

[4] EAR's records indicate that the company entered into leases or financing arrangements that are not captured in the figures contained in the table above.  Because the total cost of the equipment is not listed in EAR's leasing summaries, those figures were omitted from the table.

- **2007** – EAR paid approximately $21.2 million on equipment lease obligations. These payments exceeded the amount of income from potentially legitimate operations by approximately $16.9 million.

- **2008** – EAR paid approximately $36.2 million on equipment lease obligations. These payments exceeded the amount of income from potentially legitimate operations by approximately $33.4 million.

Put simply, any potentially legitimate operations at EAR did not and could not, and did not, fund the liability associated with the equipment leases and financing arrangements from the Fraud, including the payments to Suntrust.

36.     EAR's other expenditures and shareholder distributions further depleted any funds available from legitimate operations, establishing that money received from the Fraud was used to repay existing obligations. First, EAR had other paid expenses, such as taxes, employee wages, utilities, and rent, that depleted the amount of funding available to the company. For instance, EAR reported tax payments of $2.3 million in 2005 and $4.7 million in 2006. Second, massive shareholder distributions and other payments stripped the company of its assets. For 2007 and 2008 alone, shareholder distributions were approximately $23 million. As a result, little (if any) funding was available from legitimate operations to pay for the enormous expenses associated with EAR's lease and financing obligations. EAR's expenses, distributions, and increased cash reserves exceeded the amount of any potentially legitimate revenues.

## VII.   **EAR's Eventual Collapse**

37.     In 2009, EAR lost its ability to generate new transactions due to the economic crisis and resulting contraction of the credit market. As a result, EAR could no longer sustain the Fraud, as it could not generate sufficient new leases and financings to generate the money necessary to pay EAR's ever increasing equipment obligations. This led to EAR defaulting on its equipment obligations.

38.     Once it became apparent that EAR had engaged in fraudulent activity, EAR's officers and directors officially resigned from their positions at EAR on October 8, 2009.  With Malone and Anstett's resignation, Player also lost his position at EAR.  Brandt was then elected as sole member of the board of directors and as the Chief Restructuring Officer ("**CRO**").  The CRO was vested with the power to assume full control of all operations of EAR and all the powers and duties of its President, Chief Executive Officer, and Treasurer.  Pursuant to these powers, the CRO filed EAR's voluntary Chapter 11 bankruptcy petition to manage EAR's assets for the benefit of all creditors.  Under the Plan, Brandt was appointed as the Plan Administrator for EAR.

39.     Since his appointment as Plan Administrator, Brandt has continued his investigation of the Fraud.  His investigation revealed evidence of the Fraud at least as early as 2003.  Furthermore, for the period of from 2005 through the Petition Date, there appears to be a minimal amount of potentially legitimate business activity.

40.     Both Player and Anstett have refused to provide testimony about EAR's operations since the bankruptcy filing.  Anstett filed for personal bankruptcy.  In answering questions related to his ownership interest and work at the company, Anstett has asserted his Fifth Amendment rights and refused to testify.   In addition, Player's counsel has informed the Plan Administrator that Player would assert his Fifth Amendment privilege if called to give testimony.  Furthermore, Brandt, in his capacity as Plan Administrator, initiated litigation against Player seeking the recovery of over $18 million that Player received from EAR.   Player previously fled the state and failed to respond to these allegations.  As a result, the Court entered a default judgment in favor of the Plan Administrator.

41.     Malone has provided testimony regarding EAR in her personal bankruptcy.  But her testimony has shed little light on the events at EAR.  She has denied actually working at the company even though she sought and obtained unemployment benefits from the state of Wyoming after EAR filed for bankruptcy.  Malone was denied her discharge on the basis of fraud.  Moreover, when shown leases and company resolutions purportedly bearing her signature as EAR's Chief Executive Officer, Malone has testified under oath that some of her signatures were forged.

## VIII.   EAR Was Insolvent

42.     EAR's massive equipment obligations rendered the company insolvent at least as early as 2005.   As discussed above, a physical count of equipment performed in 2009 demonstrated that EAR possessed less than half of the equipment reflected in its financial statements.  Moreover, the equipment with a net book value of over $130 million sold at auction for a mere $6.9 million.  These results are consistent with the nature of the Fraud, whereby the equipment that was part of the Fraud was massively overvalued and leased multiple times.

43.     The fair value of EAR's equipment is far less than that which was recorded on EAR's books.  Moreover, these amounts were dwarfed by the obligations associated with EAR's leases and notes payable.  As further discussed above, EAR could not have paid its equipment obligations without the funds derived from the Fraud.  Therefore, EAR would not have been able to continue in business from 2005 through 2009 without new funds generated from the Fraud.  Accordingly, EAR was not able to pay its debts as they became due in the normal course of business throughout that period.  Furthermore, reducing the value of EAR's inventory and capital lease assets to reflect their actual value would render the company balance sheet insolvent during these periods as the company's assets would exceed its liabilities.

IX.    **Suntrust's Lease Agreements with EAR**

44.    Suntrust entered into leases with EAR related to certain equipment (the "**Leases**").  Under the terms of the Leases, EAR was required to make monthly payments to Suntrust with respect to the equipment which was identified in the Leases.

45.    EAR entered into the Leases and made required payments in furtherance of the Fraud.  As further described below, the machinery related to the Leases was purchased from MTD and was part of the Fraud.  Because EAR owned the equipment in question prior to the date of the Leases, the transactions were unnecessary from a business standpoint and served no legitimate business purpose.  Rather, EAR entered into the Leases in order to generate cash for use in paying other outstanding lease obligations as part of the Fraud.

46.    EAR used funds derived from the Fraud to make payments to Suntrust under the Leases.  As outlined in the attached exhibits, Suntrust received transfers from EAR in 2006, 2007, and 2008, during which time EAR generated almost 93% of its revenues from fraudulent sales to MTD.  Thus, any potential revenues from legitimate transactions were woefully insufficient to pay EAR's operating expenses and leasing and financing obligations.  EAR was therefore required to use funds generated from the Fraud to pay its lease and financing obligations, including the transfers to Suntrust that Brandt now seeks to recover.  Moreover, EAR made payments to Suntrust because failing to do so would have caused cross-defaults and damaged its perceived creditworthiness, thereby halting EAR's ability to enter into additional lease and financing transactions.  Because the transfers made to Suntrust were part of the Fraud, the transfers were made with the actual intent to hinder, delay, and defraud EAR's remaining creditors.

### A.  The September 2005 Lease

47.    On or about September 7, 2005, EAR and Suntrust entered into a lease agreement (the "**September Lease**") related to one piece of equipment: A Strasbaugh Model 7AF Wafer Grinder.  According to the lease, the capitalized cost was $775,000 and the required monthly payments were $16,148.60.

48.    On September 14, 2005, EAR recorded the receipt of $759,500 from MTD.  This amount was 98% of the listed value of the September Lease asset, thereby allowing MTD to retain 2% as its share on the underlying sale.

### B.  The October 2006 Lease

49.    On or about October 27, 2006, EAR and Seals Leasing Group ("**Seals**") entered into Equipment Lease Agreement No. 05344 (the "**October Lease**").  Under the terms of the lease, EAR was required to make monthly payments of $17,280.48.  The lease related to two pieces of equipment: (a) a Hoffman Double Sided Polisher Model 3100; and (b) a Strasbaugh Backgrinder Model 7AF.  Seals assigned its rights under the October Lease to Suntrust.  EAR documented the lease by recording a $518,000 capital lease asset on January 3, 2007.

50.    On October 27, 2006, EAR also recorded the sale of two pieces of equipment to MTD.  Specifically, EAR sold two pieces of equipment to MTD[5]:

| Description | Amount |
|---|---|
| FG-PRH-3100 - P.R. HOFFMAN DS LAPPER MODEL: 3100 | 164,640.00 |
| Repaired - Item: FG-STB-7AF - STRASBAUGH BACKGRINDER MODEL: 7AF | 343,000.00 |
| | $ 507,640.00 |

---

[5] According to P.R. Hoffman's website, a model 3100 is a "double sided lapping and polishing" machine. http://www.prhoffman.com/pr151931.html

The total invoice amount associated with this sale was 98% of the value of the capital lease asset recorded for the October Lease, thereby allowing MTD to retain 2% as its share on the underlying sale.

## CLAIMS FOR RELIEF

### COUNT I – FRAUDULENT TRANSFER
### UNDER 11 U.S.C. § 548(a)(1)(A)

51.     The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

52.     In accordance with the requirements of the Leases, EAR made transfers to Suntrust from its bank account(s) totaling $851,520.64 from at least December 2007 through August 2009 (the "**Lease Transfers**").   The transfers are more fully described in Exhibit A, which is attached hereto.   Discovery in this matter may identify additional transfers made to Suntrust under the terms of the Leases.

53.     The Lease Transfers were made within two years of the Petition Date.

54.     The Lease Transfers were made as a part of the Fraud at EAR.   EAR entered into the Leases in furtherance of EAR's fraudulent scheme.   Each of the Leases generated cash for EAR through the "sale" of the equipment to MTD.   These sham transactions provided EAR with the funds it required to pay existing obligations on equipment financing and lease obligations that were part of the fraudulent scheme.   Furthermore, later transactions with other Financing Entities followed the same pattern as the Leases with Suntrust.   These fraudulent transactions then provided EAR with the funds used to pay Suntrust under the terms of the Leases.   This transactional-pyramid constitutes a Ponzi scheme whereby funds received from later fraudulent transactions are used to fund prior outstanding obligations.   Therefore, the Lease Transfers were

made with the actual intent to hinder, delay, or defraud entities to which EAR was or became indebted to on or after the date of the transfer.

55.    Multiple badges of fraud are present with respect to the transactions with and transfers to the Defendant, including the following:

- EAR was insolvent during the period of the transfers, as detailed above;

- EAR had incurred, and was continuing to incur, substantial debt while it was making its payments to the Defendant;

- The true nature of the transactions with the Defendant was concealed.  EAR used MTD to disguise the fact it owned the underlying equipment.  Moreover, EAR falsely claimed that the underlying equipment transaction was based on operational needs;

- The transfers were made while EAR was under threat of potential lawsuits.  Had EAR's creditors discovered the Fraud, EAR and its principals would have been subject to numerous lawsuits.  In fact, EAR's creditors filed numerous suits alleging fraud and breach of contract once the company filed for bankruptcy. Furthermore, EAR received numerous notices of default beginning in 2009, and would have received those notices of default much earlier had it ceased making payments to any of the Financial Entities, including the Defendant;

- EAR's manager has absconded.  Player fled the state of Illinois after being ousted from the company. In addition, Player was apprehended in 2009 carrying $700,00 in cash through the airport in Denver, Colorado;

- EAR removed and concealed assets.  Player, Anstett, and Malone caused EAR to transfer millions of dollars to them personally in the form of cash payments, real

estate purchases, and other goods.  In addition, Player used EAR's funds regularly to fund gambling trips, making transfers directly from EAR's bank accounts to certain casinos to cover his gambling losses.  Furthermore, Player caused EAR to purchase assets in other peoples' names;

- EAR used MTD as a straw man or mere dummy in its transactions with the Defendant.  MTD had no legitimate interest in the underlying transaction other than to receive its cut from participating in the Fraud;

- As described in more detail above, the overall existence and cumulative effect of the pattern, series of transactions, and EAR's course of conduct indicate the transactions with the Defendant were designed to defraud creditors.  EAR incurred debt and faced financial difficulties, and as a result, entered into the transactions with the Defendant and other Financial Entities in order to further the Fraud;

- The general chronology of events and the transactions under inquiry indicate the intent to defraud.  EAR entered into equipment leases and financing arrangements on a continuous basis, regardless of the legitimate business need for the transactions.  EAR owned the equipment in question prior to the transactions, and therefore, the purpose of the transactions was to provide liquidity to fuel the Fraud.  Moreover, EAR's equipment obligations naturally increased based upon its need to enter into more and more transactions to pay for prior obligations;

- Player and Anstett, who ran EAR, have refused to testify regarding EAR and invoked their Fifth Amendment right against self-incrimination.  Ferguson, who

owned and ran MTD, failed to respond to Brandt's allegations that he participated in the Fraud;

- EAR's conduct was both exceptional and peculiar: (a) EAR had no legitimate business need to enter into the lease and financing arrangements, including those with the Defendant; (b) EAR took steps to conceal its ownership in the equipment through the use of its straw man, MTD; (c) EAR altered serial numbers for equipment and pledged assets multiple times; and (d) EAR possessed equipment that was far in excess of its needs;

- EAR made false statements, concealed facts, and operated under false pretenses. Among other things, EAR made misrepresentations concerning the following: (a) its financial condition; (b) that its revenues were largely derived from sham sales to MTD for equipment; (c) the underlying equipment transactions with the Defendant were unnecessary; (d) that EAR owned the equipment that was part of the transaction with the Defendant; and (e) the identity of EAR's management;

- There is an overall lack of a reasonable justification for the transfers at issue. EAR owned the equipment in question, and had no legitimate business need to enter into the underlying agreement with the Defendant.  Thus, the subsequent transfers lacked any reasonable business justification;

- The transactions with the Financial Entities, including the Defendant, were questionable and not in ordinary course for a legitimate business.  Companies do not repeatedly enter into leases and financings for equipment that is not necessary for operations.  Furthermore, it is both questionable and outside of the ordinary course of any business to alter serial numbers and enter into multiple leases on a

single piece of equipment (or purchase the same piece of machinery multiple times through financing) and disguise the ownership of equipment in leasing and purchasing activities;

- EAR entered into the transactions involved in the Fraud under secrecy and haste, and the transactions were unusual.  EAR disguised its transactions with MTD. Moreover, it is unusual for a company to enter into leasing and financing transactions solely for the purpose of generating funds to pay prior equipment obligations when there is no legitimate business need for the equipment;

- There is an absence of any documentation that indicates the purpose of the underlying transactions with the Defendant; and

- EAR, through Player and Anstett, were aware that: (a) EAR creditors' claims against the Company; and (b) that EAR was incapable of paying those claims.

The existence and sheer number of the badges of fraud present in this matter indicate that EAR intended to hinder, delay, or defraud its creditors in entering into and making transfers to the Defendant.

56.    Pursuant to 11 U.S.C. § 548(a)(1)(A), the plaintiff is entitled to judgment avoiding the Lease Transfers.

### COUNT II –FRAUDULENT TRANSFER
### UNDER 740 ILCS 160/5(a)(1)

57.    The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

58.    In accordance with the requirements of the Leases, EAR made the Lease Transfers as described more fully in Exhibit A.  In addition to the Lease Transfers totaling $851,520.64, EAR made additional transfers to Suntrust totaling at least $412,038.66 under the

terms of the Leases from its bank account(s) prior to November 2007. These additional transfers are more fully described in Exhibit B (the "**Additional Lease Transfers**"), which is attached hereto. Discovery in this matter may identify additional transfers made to Suntrust under the terms of the Leases.

59.    The Lease Transfers and the Additional Lease Transfers were made within four years of the Petition Date.

60.    The Lease Transfers and Additional Lease Transfers were made as a part of the Fraud at EAR. EAR entered into the Leases in furtherance of EAR's fraudulent scheme. Each of the Leases generated cash for EAR through the "sale" of the equipment to MTD. These sham transactions provided EAR with the funds it required to pay existing obligations on equipment financing and lease obligations that were part of the fraudulent scheme. Furthermore, later transactions with other Financing Entities followed the same pattern as the Leases with Suntrust. These fraudulent transactions then provided EAR with the funds used to pay Suntrust under the terms of the Leases. This transactional-pyramid constitutes a Ponzi scheme whereby funds received from later fraudulent transactions are used to fund prior outstanding obligations. Therefore, the Lease Transfers and Additional Lease Transfers were made with the actual intent to hinder, delay, or defraud entities to which EAR was or became indebted to on or after the date of the transfer.

61.    Multiple badges of fraud are present with respect to the transactions with and transfers to the Defendant, including the following:

- EAR was insolvent during the period of the transfers, as detailed above;

- EAR had incurred, and was continuing to incur, substantial debt while it was making its payments to the Defendant;

- The true nature of the transactions with the Defendant was concealed. EAR used MTD to disguise the fact it owned the underlying equipment. Moreover, EAR falsely claimed that the underlying equipment transaction was based on operational needs;

- The transfers were made while EAR was under threat of potential lawsuits. Had EAR's creditors discovered the Fraud, EAR and its principals would have been subject to numerous lawsuits. In fact, EAR's creditors filed numerous suits alleging fraud and breach of contract once the company filed for bankruptcy. Furthermore, EAR received numerous notices of default beginning in 2009, and would have received those notices of default much earlier had it ceased making payments to any of the Financial Entities, including the Defendant;

- EAR's manager has absconded. Player fled the state of Illinois after being ousted from the company. In addition, Player was apprehended in 2009 carrying $700,00 in cash through the airport in Denver, Colorado;

- EAR removed and concealed assets. Player, Anstett, and Malone caused EAR to transfer millions of dollars to them personally in the form of cash payments, real estate purchases, and other goods. In addition, Player used EAR's funds regularly to fund gambling trips, making transfers directly from EAR's bank accounts to certain casinos to cover his gambling losses. Furthermore, Player caused EAR to purchase assets in other peoples' names;

- EAR used MTD as a straw man or mere dummy in its transactions with the Defendant. MTD had no legitimate interest in the underlying transaction other than to receive its cut from participating in the Fraud;

- As described in more detail above, the overall existence and cumulative effect of the pattern, series of transactions, and EAR's course of conduct indicate the transactions with the Defendant were designed to defraud creditors. EAR incurred debt and faced financial difficulties, and as a result, entered into the transactions with the Defendant and other Financial Entities in order to further the Fraud;

- The general chronology of events and the transactions under inquiry indicate the intent to defraud. EAR entered into equipment leases and financing arrangements on a continuous basis, regardless of the legitimate business need for the transactions. EAR owned the equipment in question prior to the transactions, and therefore, the purpose of the transactions was to provide liquidity to fuel the Fraud. Moreover, EAR's equipment obligations naturally increased based upon its need to enter into more and more transactions to pay for prior obligations;

- Player and Anstett, who ran EAR, have refused to testify regarding EAR and invoked their Fifth Amendment right against self-incrimination. Ferguson, who owned and ran MTD, failed to respond to Brandt's allegations that he participated in the Fraud;

- EAR's conduct was both exceptional and peculiar: (a) EAR had no legitimate business need to enter into the lease and financing arrangements, including those with the Defendant; (b) EAR took steps to conceal its ownership in the equipment through the use of its straw man, MTD; (c) EAR altered serial numbers for equipment and pledged assets multiple times; and (d) EAR possessed equipment that was far in excess of its needs;

- EAR made false statements, concealed facts, and operated under false pretenses. Among other things, EAR made misrepresentations concerning the following: (a) its financial condition; (b) that its revenues were largely derived from sham sales to MTD for equipment; (c) the underlying equipment transactions with the Defendant were unnecessary; (d) that EAR owned the equipment that was part of the transaction with the Defendant; and (e) the identity of EAR's management;

- There is an overall lack of a reasonable justification for the transfers at issue. EAR owned the equipment in question, and had no legitimate business need to enter into the underlying agreement with the Defendant. Thus, the subsequent transfers lacked any reasonable business justification;

- The transactions with the Financial Entities, including the Defendant, were questionable and not in ordinary course for a legitimate business. Companies do not repeatedly enter into leases and financings for equipment that is not necessary for operations. Furthermore, it is both questionable and outside of the ordinary course of any business to alter serial numbers and enter into multiple leases on a single piece of equipment (or purchase the same piece of machinery multiple times through financing) and disguise the ownership of equipment in leasing and purchasing activities;

- EAR entered into the transactions involved in the Fraud under secrecy and haste, and the transactions were unusual. EAR disguised its transactions with MTD. Moreover, it is unusual for a company to enter into leasing and financing transactions solely for the purpose of generating funds to pay prior equipment obligations when there is no legitimate business need for the equipment;

- There is an absence of any documentation that indicates the purpose of the underlying transactions with the Defendant; and

- EAR, through Player and Anstett, were aware that: (a) EAR creditors' claims against the Company; and (b) that EAR was incapable of paying those claims.

The existence and sheer number of the badges of fraud present in this matter indicate that EAR intended to hinder, delay, or defraud its creditors in entering into and making transfers to the Defendant.

62.     Pursuant to 11 U.S.C. § 544(b)(1) and 740 ILCS 160/5(a)(1), the Plaintiff is entitled to judgment avoiding the Lease Transfers and the Additional Lease Transfers.

### COUNT III – PREFERENCE
### UNDER 11 U.S.C. § 547

63.     The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

64.     In the 90 days immediately preceding the Petition Date, EAR transferred to Suntrust the sum of $17,280.48 (the "**Preferential Transfer**").  Specifically, Suntrust received the transfer from EAR's bank account at Norstates Bank on or about August 7, 2009.

65.     The Preferential Transfer was made to or for the benefit of Suntrust, a creditor of EAR.

66.     The Preferential Transfer was made for or on account of an antecedent debt owed by EAR before the Preferential Transfer was made.

67.     The Preferential Transfer was made while EAR was insolvent.

68.     The Preferential Transfer was made on or within 90 days before the Petition Date.

69.     The Preferential Transfer enabled Suntrust to receive more than it would have received if the case were a case under Chapter 7 of title 11 of the United States Bankruptcy Code

(the "**Code**"), the Preferential Transfer had not been made, and the Defendant received payment on such debt to the extent provided by the provisions of the Code.

70.    Pursuant to 11 U.S.C. § 547, the Plaintiff is entitled to judgment avoiding the Preferential Transfer.

### COUNT IV – RECOVERY OF THE VALUE OF THE AVOIDED TRANSFERS UNDER 11 U.S.C. § 550

71.    The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

72.    For the reasons set forth above, Plaintiff is entitled to avoid the Lease Transfers the Additional Lease Transfers, and the Preferential Transfer.

73.    Suntrust was the initial transferee of the Lease Transfers the Additional Lease Transfers, and the Preferential Transfer as Suntrust received the funds transferred from EAR.

74.    Pursuant to 11 U.S.C. § 550, Plaintiff is entitled to recover the value of the Lease Transfers the Additional Lease Transfers, and the Preferential Transfer from Suntrust.

### COUNT V – DISALLOWANCE OF CLAIM UNDER 11 U.S.C. § 502(d)

75.    The Plaintiff re-alleges and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

76.    The Lease Transfers and Additional Lease Transfers are avoidable under 11 U.S.C. § 548 and 740 ILCS 160/5.  The Preferential Transfer is avoidable under 11 U.S.C. § 547.

77.    Pursuant to 11 U.S.C. § 502(d), any claims of Defendant against the Debtor must be disallowed until such time as Defendant pays the Lease Transfers, Additional Lease Transfers, and Preferential Transfer as provided in 11 U.S.C. § 502(d).

## **PRAYER**

Wherefore, Plaintiff respectfully requests that the Court enter judgment and grant it the following relief against Suntrust:

1.  Entering an order of judgment avoiding the Lease Transfers under 11 U.S.C. § 548(a)(1)(A);

2.  Entering an order of judgment avoiding the Lease Transfers and the Additional Lease Transfers under 740 ILCS 160/5(a)(1);

3.  Entering an order of judgment avoiding the Preferential Transfer under 11 U.S.C. 547;

4.  Entering an order of judgment in the amount of $1,263,559.30 in favor of the Plaintiff and against Suntrust;

5.  Entering an order disallowing any payment or claim held by Defendant, to the extent on exists, pursuant to 11 U.S.C. § 502(d);

6.  Prejudgment and post-judgment interest as allowed by law; and

7.  All other relief to which it is entitled.

Dated: July 3, 2013                       Respectfully submitted,

                                              /s/ *Jon Maxwell Beatty*
                                          One of the attorneys for Plaintiff
                                          William A. Brandt, Jr., solely in his capacity as Plan
                                          Administrator for Equipment Acquisition
                                          Resources, Inc.

                                          Allan B. Diamond (TX Bar 05801800)
                                          adiamond@diamondmccarthy.com
                                          Jon Maxwell Beatty (TX Bar 24051740)
                                          mbeatty@diamondmccarthy.com
                                          Diamond McCarthy LLP
                                          909 Fannin, Suite 1500
                                          Houston, Texas 77010
                                          Tel:  (713) 333-5100
                                          Fax:  (713) 333-5199

### Exhibit A to Complaint
*The "Lease Transfers"*

| Date | Amount |
|------|--------|
| 12/10/2007 | $ 16,148.60 |
| 1/9/2008 | $ 16,148.60 |
| 1/31/2008 | $ 17,280.48 |
| 2/11/2008 | $ 16,148.60 |
| 2/12/2008 | $ 217,500.00 |
| 3/3/2008 | $ 17,280.48 |
| 3/10/2008 | $ 16,148.60 |
| 3/31/2008 | $ 17,280.48 |
| 4/9/2008 | $ 16,148.60 |
| 5/1/2008 | $ 17,280.48 |
| 5/9/2008 | $ 16,148.60 |
| 6/2/2008 | $ 17,280.48 |
| 6/9/2008 | $ 16,148.60 |
| 6/30/2008 | $ 17,280.48 |
| 7/9/2008 | $ 16,148.60 |
| 7/31/2008 | $ 17,280.48 |
| 8/11/2008 | $ 16,148.60 |
| 9/3/2008 | $ 17,280.48 |
| 9/9/2008 | $ 16,148.60 |
| 10/1/2008 | $ 17,280.48 |
| 10/9/2008 | $ 16,148.60 |
| 10/31/2008 | $ 17,280.48 |
| 11/12/2008 | $ 16,148.60 |
| 12/2/2008 | $ 17,280.48 |
| 12/9/2008 | $ 16,148.60 |
| 1/9/2009 | $ 16,148.60 |
| 2/2/2009 | $ 17,280.48 |
| 2/10/2009 | $ 16,148.60 |
| 3/3/2009 | $ 17,280.48 |
| 3/10/2009 | $ 16,148.60 |
| 3/31/2009 | $ 17,280.48 |
| 4/9/2009 | $ 16,148.60 |
| 5/1/2009 | $ 17,280.48 |
| 5/11/2009 | $ 16,148.60 |
| 6/2/2009 | $ 17,280.48 |
| 6/9/2009 | $ 16,148.60 |
| 7/1/2009 | $ 17,280.48 |
| 7/9/2009 | $ 16,148.60 |
| 8/7/2009 | $ 17,280.48 |
| | $ 851,520.64 |

**Exhibit B to Complaint**
*The "Additional Lease Transfers"*

| Date | Amount |
|------|--------|
| 4/11/2006 | $ 16,148.60 |
| 5/9/2006 | $ 16,148.60 |
| 6/9/2006 | $ 16,148.60 |
| 7/11/2006 | $ 16,148.60 |
| 8/9/2006 | $ 16,148.60 |
| 9/11/2006 | $ 16,148.60 |
| 10/11/2006 | $ 16,148.60 |
| 11/9/2006 | $ 16,148.60 |
| 12/11/2006 | $ 16,148.60 |
| 1/31/2007 | $ 17,280.48 |
| 2/9/2007 | $ 32,297.30 |
| 4/2/2007 | $ 17,280.48 |
| 4/9/2007 | $ 16,148.60 |
| 4/30/2007 | $ 17,280.48 |
| 5/9/2007 | $ 16,148.60 |
| 5/31/2007 | $ 17,280.48 |
| 6/11/2007 | $ 16,148.60 |
| 7/5/2007 | $ 17,280.48 |
| 7/9/2007 | $ 16,148.60 |
| 7/30/2007 | $ 17,280.48 |
| 8/9/2007 | $ 16,148.60 |
| 8/31/2007 | $ 17,280.48 |
| 9/10/2007 | $ 16,148.60 |
| 9/20/2007 | $ 16,549.00 |
| | $ 412,038.66 |